IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MARK A. WALSKI,

OPINION AND ORDER

               Plaintiff,

12-cv-844-bbc

    v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       Plaintiff Mark Walski has moved for judicial review of the final decision of defendant Carolyn W. Colvin, Acting Commissioner of Social Security, denying his application for disability insurance benefits under the Social Security Act.  Plaintiff contends that his carpal tunnel syndrome, complex regional pain syndrome, spondylosis, stenosis, degenerative disc disease in his neck, Epstein Barr syndrome and depression render him disabled under the Act.  Defendant disagrees, arguing that despite his impairments, plaintiff retains the residual functional capacity to perform a limited range of light work.

       I conclude that the administrative law judge acted correctly in deciding that plaintiff was not so impaired as to be unable to perform any substantial gainful work.  Therefore, plaintiff's motion for summary judgment will be denied and judgment will be entered in favor of the commissioner.

RECORD FACTS

1

Plaintiff was born on January 21, 1973.  He finished the twelfth grade and worked in utility construction for seven years in a job that qualified as heavy.  Later he worked for Charter Communications as a cable installer until he injured his right hand and shoulder in a ladder accident on or about October 6, 2006, his alleged onset date.

## A. Medical Evidence

### 1. Treating physicians

Plaintiff had carpal tunnel surgery with tendon release in 2005, while working for Charter.  Dr. Matthew Bliss did a revision of the right carpal tunnel release in April 2007 after plaintiff's ladder accident.  AR 568-69.  In January 2008, plaintiff told Bliss that his pain had worsened after he had been shoveling snow.  Bliss observed that plaintiff had "full active painless range of motion in his shoulder and elbow."  AR 276.  He noted that plaintiff was holding his hand in "a very classic pain like posture," but that his examination demonstrated no psychomotor changes, no blanching, no pallor or decreased turgor" (skin elasticity) in the right hand as compared with the left.  Id.  Plaintiff had some reduced grip and pinch strength but he displayed normal pronation and supination of the wrist as well as normal motor and sensory examinations.  AR 276.  His pain increased again in October 2008, when he tried moving furniture, AR 253, but he told his doctor that his symptoms had been stable since the preceding January.  AR 255.

In a report signed on July 8, 2008, Dr. Bliss wrote that plaintiff had a permanent disability that would restrict him to light work with no lifting of more than 20 pounds with

his left hand and 10 pounds with his right, no forceful or repetitive grasping, pinching, pushing, pulling or repetitive fine manipulation with his right hand.  Bliss estimated plaintiff's percentage of permanent disability as 6% resulting from the loss of right hand grip strength; 2% resulting from loss of right lateral pinch; 3% resulting from loss or right wrist flexion; 1% resulting from loss of right wrist extension and 5% resulting from pain affecting functional use of right upper extremity.  AR 569.

Starting in December 2008, plaintiff saw Dr. Douglas Keehn for pain in his right upper extremity and for pain, diffuse tenderness to light touch, numbness and weakness in his right hand.  AR 290-99.  Starting in January 2009, plaintiff underwent a number of spinal cord stimulator implantations and revisions at Dr. Keehn's suggestion.  AR 380-84. After the first trial stimulator, plaintiff reported that his neck pain had resolved after a few days and that he had had about 50% relief in his pain.  AR 290.  On February 16, Dr. Keehn implanted a spinal cord stimulator.  A month later, on March 24, 2009, he did a spinal cord stimulator revision after plaintiff experienced right hand and joint pain that was aggravated by any movement.  AR 366, 375-77.

On October 13, 2009, Dr. Keehn performed  a cervical spinal cord stimulatory lead placement with laminotomy at C5-6 to ease plaintiff's severe intractable pain to the right. AR 394-415.  When plaintiff complained of neck pain after the surgery, Keehn performed a repositioning surgery six days later to address an initial malpositioned spinal cord stimulator lead.  AR 428-502.

At a followup visit on December 2, 2009, plaintiff described his right hand and joint

pain as gnawing, aching, and tingling.  AR 531.  He reported continuing weakness in his right hand and upper extremity and said that his pain interfered with his daily activities and his sleep.  Id.

On January 11, 2010, plaintiff saw Dr. Andrew Wright at the Muscoda Health Center and told Wright that he was in much less pain after his October 2009 surgery but that he still experienced pain in his upper arm and numbness through his hand, particularly in his first few digits.  AR 562-63.  Wright found that plaintiff had full range of motion of his neck in all planes and his grip strength was 4/5 in his right hand and 5/5 in his left.  Wright started plaintiff on a course of Cymbalta for his generalized anxiety.  AR 563.  Later in the month, Wright reported that plaintiff was not interested in any physical therapy, but Wright had encouraged him to stretch.  AR 558.

On April 19, 2010, Wright filled out a report on plaintiff's condition, giving plaintiff a permanent restriction of no lifting of more than 20 pounds.  AR 566.  In Wright's opinion, the prognosis for plaintiff's disability was poor because of the complex regional pain syndrome affecting his right arm and hand.  Id.

On July 22, 2010, Dr. Keehn removed the previously implanted spinal cord stimulator, which had become infected.  AR 742-45.  Plaintiff was discharged on July 25, in stable condition, with directions to continue on IV antibiotics and Naficillin at the Richland Medical Center.  AR 739-740.

In October 2010, plaintiff had an MRI of his cervical spine that was normal, with the exception of a small annular tear, minimal right neural foramina narrowing, mild spinal

4

stenosis and minimal broad-based disk bulge at C5-C6.  AR 758.

At a November 2010 visit, Wright observed that although plaintiff complained of unbearable pain, he was moving his neck freely without pain, did not move his right arm "too much," had a 3 to 4 to 5 grip strength in his right arm, was not in acute distress and had no neurologic defect.  AR 696.

On November 18, 2010, plaintiff went to a pain clinic at the University of Wisconsin Hospitals, on referral from Drs. Wright and Keehn.  AR 788.  Plaintiff reported constant pain that felt like needles being stuck into his arm and hand and worsened when he used his right upper extremity.  He also described constant throbbing and stabbing pain in his neck that he said had been present since his spinal cord stimulator system had been removed.  Id. The doctors recommended weaning plaintiff off his short-acting opiate medications.  AR 784.  At his next visit, plaintiff told the doctors he had been "fine" with his former dosage of medication.  AR 783.

On January 18, 2011, plaintiff had a endoscopy that was normal.  AR 618. A week later, he saw Dr. Wright with a complaint of epigastric pain.  AR 689.  Wright noted that plaintiff did not mention any arm pain during the visit, that he moved his arm around freely during the visit and he told Wright that his complex regional pain syndrome had been stable. AR 690.  To ease the epigastric pain plaintiff was experiencing, Wright added Carafate to plaintiff's medications.

B. Functional Capacity Evaluation

5

Plaintiff had a functional capacity evaluation at Meriter Hospital on November 4, 2010, on referral from Dr. Wright.  AR 869.  The examiner found that plaintiff had decreased sensations in his right neck and upper extremities, moderate tenderness in his hand and wrist with severe tenderness in his scalenes and upper trapezius.  AR 875-76.  His range of motion was decreased on his left.  AR 876.  He had average speed in walking and held his right hand away from his body, not swinging it, but he did no physical holding of his body parts, and the correlation with his pain rating was good.  AR 877.  The evaluator reported that plaintiff demonstrated some symptom exaggeration in the form of movement inconsistencies.  For example, he was able "to move his head more incidentally than with formal demonstration."  AR 889.  In addition, he "described pain reduction within 10 min. of orally taking medication."  Id.  In her opinion, plaintiff's tested abilities were light medium work with positional changes.  AR 873.

## C. Medical Consultants' Report

In January 2010, agency consultant James Cole, M.D., evaluated plaintiff's medical condition, AR 510-15, and found that plaintiff could lift 20 pounds occasionally, 10 pounds frequently; he could stand or walk or sit for about six hours a day; he could do limited pushing and pulling in his upper extremities; and he could do limited handling and fine manipulation.  AR 510-12.  The only environmental limitation Cole imposed was the avoidance of concentrated exposure to extreme cold and vibration.  AR 513.  In Cole's opinion, plaintiff could function as a "nearly one armed man," using his right hand and arm

to assist in lifting 20 pound weights.  AR 514.  He found plaintiff's reports of inability to walk and stand unsupported by the file evidence and concluded that plaintiff could perform light work, although he could use his right hand only occasionally for gross movements and fine motor activities.  AR 514.  In his opinion, plaintiff's credibility was compromised by his doctor's assessment that he was addicted to narcotics and tobacco and by his own record of using fentanyl patches, hydrocodone, percocet, methadone, oxycodone and neurontin.  Id.

Dr. Mina Korshidi, an agency physician, evaluated plaintiff's physical residual functional capacity in June of 2011, AR 575, reaching the same conclusions as Cole had about plaintiff's physical capability.  She did not assess any environmental limitations.  AR 579.  She did not believe his statements that he could walk only 10 feet and sit, stand or walk no more than three hours a day in light of the lack of any medical support for his claim of trouble walking or having decreased strength in his upper extremities or pain or symptoms in his left extremities.  AR 582.  In her opinion, plaintiff had the  residual functional capacity to perform light work, with occasional use of his right upper extremities.  Id.

Joan Kojis, a state agency psychologist, completed a psychiatric review technique of plaintiff in June 2010.  AR 583-95.  She found that he had an impairment that was  not severe, specifically the affective disorder of depression, AR 583, 586, and that it did not limit plaintiff in any way.  AR 593.  His reported activities of daily living indicated no trouble with his attention span or concentration, no trouble following directions and no problem with stress and change.  AR 595.

D. <u>Administrative Hearing</u>

At his administrative hearing, plaintiff described his various surgeries and the effort to implant a stimulator.  AR 56-57.  He said that he had pain in his right leg, right hand, arm, shoulder and the right side of the neck up into the back of his head, that the location of the pain had changed significantly since his injury and that he had restarted physical therapy for the pain a month before the hearing.  AR 57-58.  He said he was on various medications prescribed by his doctors, who put him on different doses of methadone and morphine, and that the medications kept him from sleeping.  AR 59.  He also testified that he had needed emergency care for esophagitis three weeks before the hearing, for which he had been given an oral dose of Lidocaine, and that swelling in his lymph nodes caused him pain as often as three to four times a month and lasted a few days to a week.  AR 61-62.  He said that he had experienced pain during his functional capacity evaluation and had had to lie down and take extra pain medication while the test was ongoing; after the test, his doctors had prescribed extra pain medication and he had spent two to three days in bed recuperating.  AR 64.  He denied that he had had any improvement in his condition at any time during the preceding four years.   AR 65.

The administrative law judge called a vocational expert, Karl Botterbusch, and asked him a question about a hypothetical younger individual with a high school degree, who could work in the light exertional range, who could not lift more than 10 pounds with the right upper extremity, or do any forceful or repetitive grasping, pinching, pushing or pulling or fine manipulation with the right hand and no repetitive pushing or pulling with the right

8

upper extremity and could have no exposure to extremes of cold or vibration.  AR 71.  The expert testified that such a person could not do medium to heavy work, but could work as a sales attendant, x-ray inspector or bottle beverage inspector and that the first two jobs exist in large numbers nationally and in Wisconsin, while there are about 200-250 of the third job of bottle inspector in Wisconsin.  Id.  He explained that although the bottle beverage inspector job is listed as lower level semi-skilled in the <u>Dictionary of Occupational Titles</u>, his own observations of a bottling plant in Minnesota convinced him that the job is actually an unskilled one.  AR 72-73.  If the hypothetical individual had to have a sit/stand option or the ability to move around the work place, only the bottle beverage inspector position would be available.  Id.

### E. Administrative Law Judge's Decision

In her decision, the administrative law judge followed the required five-step evaluation process.  At step one, she found that plaintiff had not engaged in any substantial gainful activity since October 2, 2006, the alleged onset date.  Although he had worked as a cook and bartender for about two months in 2009, this work did not rise to the level of substantial gainful activity.  She noted that plaintiff had held himself out as ready and able to work in order to receive unemployment compensation from the three quarters from fall 2009 to spring of 2010 and that he had some other incentives not to work: the receipt of approximately $24,000 from a worker's compensation settlement and another $13,000 from a class action suit against his former employer.  AR 18.

At step two, the administrative law judge found that plaintiff had the severe impairments of right upper extremity complex regional pain syndrome, carpal tunnel syndrome and degenerative disc disease of the cervical spine.  She found that his history of lymph nodes, Barrett's esophagitis and depression were not severe impairments.  AR 19. (Neither she nor plaintiff ever mentioned Epstein Barr syndrome, which plaintiff had reported having at one time.)  Plaintiff had had no symptoms or treatment for lymph nodes during the relevant period and as for his esophagitis, he had had a normal endoscopy in January 2011 and his pain and symptoms had been reduced with the medication he was taking.  Id.  His depression did not cause him more than minimal limitation in his ability to perform basic mental work activities and, although he had been prescribed medications by his treating doctor, he had no record of any psychiatric consultation, hospitalization, counseling or therapy for the condition.  Id.  The administrative law judge also noted that plaintiff had no limitations in his activities of daily living, in social functioning or in concentration, persistence and pace and he had never experienced any episodes of decompensation of extended duration.  Id.

At step three, the administrative law judge concluded that plaintiff's severe impairments caused more than minimal limitations of his ability to perform basic work activities, but that considered separately or in combination, the impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. At step four, she found that plaintiff could not perform the requirements of his past relevant work but that he had the residual functional capacity to perform light work as defined in 20

C.F.R. § 404.1567(b), with additional limitations: no lifting of more than ten pounds with his right upper extremity, no forceful or repetitive grasping, pinching, pushing, pulling or fine manipulation with his right hand and no exposure to extreme cold or heat. AR 20-21. She limited plaintiff to an at-will sit/stand option and the ability to change positions in the workplace. AR 21.

The administrative law judge explained that she did not find plaintiff's allegations about his symptoms and resulting limitations entirely credible or consistent with the objective medical evidence. His activities of daily living did not jibe with the claimed severity of his impairments: he was able to live independently, care for his children, attend to personal care tasks, prepare meals, drive a vehicle and shop. AR 23. Moreover, his physical examinations had showed only minimal symptoms and normal motor strength, with only occasional reductions in sensation and strength in the right upper extremity. Id. She found plaintiff's credibility reduced by his receipt of unemployment compensation for nine months in 2009 and 2010, when the requirement for receiving the benefit is the ability and readiness to work. Id. Finally, she noted that a number of the statements plaintiff made during the administrative hearing were contradicted by information in his treatment records. Id. As she explained,

> In addition, MRI testing has revealed minimal findings with regard to his alleged neck impairment, The overall physical findings, effectiveness of medication treatment, and the claimant's daily activities support his ability to perform work within the residual functional capacity above. Moreover, multiple treating doctors and a functional capacity evaluator noted that the claimant would be able to work with restrictions that are consistent with the limitations set forth in the residual functional capacity and support the conclusion that he is more functional than he alleges.

11

AR 23.

At step five, the administrative law judge found that because plaintiff was a "younger individual," had at least a high school education, was able to communicate in English, and had the ability to perform jobs that exist in the national economy for an individual of his age, education, work experience and residual functional capacity, he was not disabled, but was capable of performing a limited range of light work, such as the representative occupation of bottle beverage inspector.  AR 25.  Accordingly, she found plaintiff had not been under a disability from October 6, 2006 through the date of her decision.


OPINION

Plaintiff contends that the administrative law judge erred in three major respects in determining that he was not disabled:  (1) she failed to consider all the evidence in deciding his residual functional capacity; (2) she made an improper credibility determination; and (3) she erred at step five of the determination in giving the vocational expert an incomplete hypothetical question, leading her to accept the expert's flawed testimony that plaintiff could perform the job of bottle beverage examiner.


A. Failure to Consider All the Evidence

Plaintiff argues that the administrative law judge failed to consider all the evidence bearing on his residual functional capacity, leading her to an erroneous conclusion.  He objects to her placing weight on Dr. Wright's evaluation without acknowledging that Dr.

Wright had found that plaintiff had a poor prognosis.  As the government points out, Wright made the poor prognosis comment on the same form on which he assessed plaintiff's permanent restrictions.  It was reasonable for the administrative law judge to read Wright's comment to mean that it was unlikely that the permanent restrictions would ease with time, rather than that plaintiff had a poor prognosis overall.

Plaintiff takes issue as well with the administrative law judge's statement that she was considering Dr. Cole's report, when her determination of plaintiff's residual functional capacity was in direct conflict with Cole's findings.  In fact, her determination pretty much tracked Cole's:   plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, stand, walk or sit for six hours out of an eight-hour day.  She accounted for these limitations by restricting plaintiff to light work, for which he was qualified because he met both the lifting and the standing/walking restrictions.  She accounted for Cole's opinion that plaintiff could do only limited pushing and pulling in his upper extremities and limited handling and fine manipulation and was "essentially a one-armed man," by  restricting him to a job that did not require repetitive arm or hand motions and no lifting of more than ten pounds.  Moreover, she did not confine her determination of plaintiff's residual functional capacity to Cole's report, but placed "great weight" on the reports of plaintiff's treating physicians, Dr. Bliss and Dr. Wright.

The administrative law judge did not discount the test results from the functional capacity evaluation, as plaintiff asserts.  What she did discredit was plaintiff's report of pain following the testing, because the record lacked any indication that plaintiff saw a doctor for

13

pain until some time after the testing had been completed.  Plaintiff concedes in his opening brief that he did not visit a doctor "to address worsening pain post-FCE."  Plt.'s Br., dkt. #13, at 11.

Plaintiff criticizes the administrative law judge's failure to consider SSR 03-02p after she had found at step two of her decision that plaintiff's chronic regional pain syndrome was severe.  (According to SSR 03-02p, chronic pain syndrome can result from trauma to a single extremity or from diseases, surgery or injury affecting other parts of the body.  Its acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the side of the precipitating trauma.)  The administrative law judge explained in detail that she found plaintiff's allegations about the intensity and debilitating effect of the syndrome not entirely credible primarily because his physical examinations showed only minimal symptoms and his treating doctors and functional capacity evaluation reported him capable of working well within the same residual functional capacity she had assessed.  AR 23.

Plaintiff argues that the administrative law judge was "playing doctor" when she downplayed the severity of the syndrome in reliance on reports of physical examinations showing only minimal symptoms.  He argues that minimal findings do not necessarily translate to mild limitations, but the administrative law judge did not confine her decision to the minimal findings.  She also took into consideration observations of treating doctors and the functional capacity evaluator that plaintiff was able to move his neck and his right upper extremities when he was not complaining about them, as well as his activities of daily

14

living: playing with his children, driving, etc.

The administrative law judge acknowledged that plaintiff's complex regional pain syndrome was a severe impairment but that it was not so intense, persistent or limiting as to restrict plaintiff's abilities beyond those that she had assessed at step four.  This was a reasonable finding.  If the primary (or only) manifestation of a  syndrome is intense and debilitating pain, the lack of such pain and the absence of any indications of debilitation are strong indicators either that the pain does not exist or that it is not so intense as to render plaintiff disabled.  Moreover, as the administrative law judge pointed out, AR 22, the medical evidence and the report of the functional capacity evaluator show that plaintiff was more functional than he alleged; his 2008 complaints of increased pain reflected increased physical activity, such as shoveling snow, AR 275, or moving furniture.  AR 253.

In December 2008, plaintiff had an MRI after he complained of pain consistent with cervical radiculopathy.  The test revealed only mild degenerative disc disease.  It was negative for disc protrusion, central spinal stenosis or other findings that would explain his alleged right side symptoms.  After his spinal cord stimulator was tested and then installed, plaintiff noted significant improvements in his right upper extremity pain. He had an MRI of his cervical spine in October 2010 that showed that no further surgical intervention was needed or would be helpful.  This is strong evidence that plaintiff was not disabled by his syndrome. In addition, the 2010 functional capacity evaluation showed that plaintiff could function within the limits set forth by the administrative law judge at step four.

Plaintiff argues that the administrative law judge did not give consideration to his

15

depression and should have ordered a consultative examination if she thought the record lacked evidence of any psychiatric impairment.  He does not explain why she would have thought that plaintiff had a psychological impairment.  It is true that she had the report from the state agency psychologist, as well as the information that plaintiff had had a diagnosis of depression and had been treated with medication, but she also knew that plaintiff had no record of any psychiatric consultations, hospitalization, counseling or therapy related to any mental health problem; he had never alleged any significant work-related problems caused by his depression; and his daily activities did not suggest that he was suffering from depression. Under these circumstances, the administrative law judge had no reason to seek out additional psychological evaluation.

Finally, plaintiff argues that the administrative law judge did not consider the aggregate of plaintiff's impairments, but he did not really suffer from an aggregate of impairments.  The relevant impairments were essentially those associated with his right hand and arm, including his complex regional pain syndrome, all of which she did consider.

## B. Plaintiff's Credibility

Plaintiff argues at length about the flawed credibility determination that the administrative law judge made, criticizing her for relying on such factors as his ability to care for his children and play with them, what she saw as the lack of any objective medical evidence supporting his claims of disability, the findings of the doctors that plaintiff could work, his receipt of unemployment benefits, worker's compensation and class action

settlement proceeds and the medical records' contradiction of statements plaintiff made at the hearing. He objects not only to her reliance on these matters but also for not specifying the records on which she was relying. It is not the case that the administrative law judge did not specify the reasons for her decision or the records on which she relied. They are spelled out in her decision at pages 21-24.

Plaintiff is correct in arguing that it would be improper to assess his credibility solely on the fact that he was receiving unemployment benefits during a time when he was maintaining that he was disabled for Social Security purposes. On the other hand, the court is not required to disregard entirely a claimant's decision to apply for unemployment benefits, thereby representing that he is ready and able to work. Schmidt v. Barnhart, 395 F.3d 737, 746 (7th Cir. 2005). As in Schmidt, plaintiff's decision to apply for unemployment benefits was only one of many factors that bore on plaintiff's credibility. Others included plaintiff's December 14, 2010 statement to Dr. Wright that his neck and arm pain was "unbearable" and Wright's observation at the same visit that plaintiff was moving his neck freely, without pain, and seemed to be in no acute distress. AR 695-96.

Another factor was plaintiff's statement that he was in pain and confined to bed for three days after his October 2010 functional capacity evaluation. With nothing in the record to support this statement, including evidence of any visit to a doctor, the administrative law judge was entitled to find the statement another instance of plaintiff's untrustworthiness as a historian. She could also find that plaintiff's repeated statements to his doctors that his treatment was controlling his symptoms cast doubt on his assertions at other times that he

17

was in constant pain.  Finally, she could consider the inconsistency between the reports and observations of plaintiff's doctors and his own allegations about his pain and the severity of his condition.  As she pointed out, when plaintiff changed doctors in late November 2010 because of changes in his insurance coverage, he responded to their attempts to reduce the number of narcotic pain medications he was taking.  After doing so, he complained of increasing pain, saying that his level of functioning under his previous medication regime had been adequate.

As for the administrative law judge's discussion of plaintiff's activities of daily living, plaintiff is correct in saying that it is improper to base a finding of disability upon a claimant's ability to do some household chores.  The Court of Appeals for the Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time."  Carradine v. Barnhart, 360 F.3d 751, 755-56 (7th Cir. 2004); Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000); see also Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons and is not held to a minimum standard of performance, as she would be by an employer.").  The administrative law judge did not base her decision on plaintiff's daily activities but suggested that plaintiff's ability to play with his kids and to care for them was one factor among others for her conclusion that his disability was not as severe as he represented it.  This was not an improper conclusion to draw.

## C. Incomplete Hypothetical Question

Plaintiff's final objection to the administrative law judge's decision is that she posed an incomplete hypothetical question to the vocational expert.  He says she failed to account for the limitations assessed by Dr. Cole, who limited plaintiff to occasional use of his right hand for fine and gross motions.  In fact, she framed the question to the expert as precluding any lifting or more than 10 pounds and involving no repetitive grasping, pinching, etc.  The vocational expert testified that plaintiff could perform a number of jobs, but that if he had to have a sit/stand option or move around at will, he could perform the job of bottle beverage inspector.  He based this opinion on his experience placing employees at a bottling plant in Minnesota.  He also said that 200-250 of these jobs existed in Wisconsin and about 5000 existed through the country.

Plaintiff objects both to the expert's reliance on his own experience in one plant in another state for a finding that the job is not semi-skilled and to the small number of jobs the expert was able to identify within Wisconsin.  200-250 jobs is a sufficient number.  Liskowitz v. Astrue, 559 F.3d 736, 743 (7th Cir. 2009) ("as few as 174 jobs has been held to be significant") (citing Allen v. Bowen, 816 F.2d 600-02 (11th Cir. 1987)).  Although plaintiff points out that the numbers of jobs is a small one for a state as large as Wisconsin, the law does not require that the work exist in the immediate area in which the claimant lives.  The Social Security Administration considers that "work exists in the national economy when it exists in significant numbers either in the region where you live or in several other areas of

19

the country."  § 404.1566(a).  <u>Id</u>.

Plaintiff objects to the administrative law judge's acceptance of the vocational expert's classification of the bottle beverage job as unskilled when the <u>Dictionary of Occupational Titles</u> classifies it as semi-skilled, but she did not simply take the expert's word for the classification.  She questioned him about his reasons for thinking the job fit into that classification and learned that he had personally observed the work at a Minnesota plant when he had placed workers there in conjunction with the Mankato Rehabilitation Center. It was proper for her to rely on the expert's information and experience.  <u>Overman v. Astrue</u>, 546 F.3d 456, 464 (7th Cir. 2008) ("[a]n [administrative law judge] is free to accept testimony from a [vocational expert] that conflicts with the [Dictionary of Occupational Titles] when, for example, the [expert's] experience and knowledge in a given field exceeds that of the [Dictionary's] authors").

In summary, I conclude that plaintiff Mark Walski has failed to show that the administrative law judge erred in concluding that he was not under a disability as defined in the Social Security Act.


ORDER

IT IS ORDERED that plaintiff Mark Walski's motion for summary judgment or remand, dkt. #11, is DENIED and  the decision of defendant Carolyn W. Colvin, Acting Commissioner of Social Security, denying plaintiff's application for disability insurance

benefits is AFFIRMED.  The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 8th day of October, 2013.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge